# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISIÓN

### Case Number: 1:17-cv-21997-DPG

**CARMEN TAUFER**

Plaintiff(s)

Vs.

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
a South Dakota for profit corporation,

**JP MORGAN CHASE BANK, NATIONAL ASSOCIATION**,
an Ohio for profit corporation,

**RUSHMORE LOAN MANAGEMENT SERVICES, LLC;**
a California for profit Limited Liability Company,

**BEN-EZRA & KATZ, P.A**.
a Law Firm, a Florida for Profit Corporation,

**THE LAW OFFICE OF GARY GASSEL, P.A**.
a Florida for Professional Association,

**DOES 1-20**
Defendant(s)
----------------------------------------//

# FIRST AMENDED COMPLAINT
## 15 U.S.C. 1692, et. Seq,

1. Federal Plaintiff Carmen Taufer (hereafter: "Taufer") through her undersigned attorney sue each and every one of the above-mentioned Defendants Individually, Jointly and Severally for violations of the Fair Debt Collections Practices Act, 15 U.S.C. §1692 *et seq,* (hereinafter: "FDCPA"), the Florida Consumer Collection Practices Act Fla. Stat. §§559.55 to 559.785 and §559.72. (hereafter "FCCPA"), the Florida's Deceptive and Unfair Trade Practices Act), sections 501.201-.213. (hereinafter: "FDUTPA"), and the Truth In Lending Act (hereinafter: "TILA");

2. These laws prevent debt collectors from, *inter alia,* engaging in abusive, deceptive, and unfair collection practices.

3. Taufer, hereby files her First Amended Complaint within the 20 days of the Endorsed Order (DE 34) entered by Honorable Judge Darrin P. Gayles on 10/12/2017, GRANTING Taufer (DE 21), her Motion to Vacate  (DE: 15, 16, 17),  the Orders of Dismissal of the case he entered on 07/18/2017, and GRANTING Taufer / *Plaintiff's Ore Tenus Motion for Leave to Amend the Complaint as a "Matter of Course" under Rules 15(A)(1) stating that <u>Plaintiff Carmen Taufer shall file an amended complaint within 20 days of this Order</u>.* Signed by Judge Darrin P. Gayles on 10/12/2017 (hmo).

4. As it stands, All Motions to Dismiss Taufer's Complaint For Damage (DE: 1) and all Motions for Sanctions filed against Taufer and her attorney Oviedo-Reyes, Esq, filed by the different Defendants were DENIED by this Honorable Court on 10/11/2017 and Taufer's Motion to Vacate the Orders of Dismissal was GRANTED by this Honorable Court on 10/12/2017.

## I. INTRODUCTION AND NATURE OF THIS ACTION

1. This complaint is seeking Statutory, Actual and Punitive Damage where applicable and is derived from a foreclosure action filed by Defendant "Ben-Ezra & Katz, P.A." a Law Firm, on 11/04/2010, in the Circuit Court of Miami-Dade County, Florida, Case # 2010-058746-CA-13, entitled *"Wells Fargo Bank, N.A. not in its Individual Capacity but Solely as Trustee for the RMAC REMIC Trust Series 2010-3, Plaintiff vs. Carmen Taufer, Defendant"*, containing misleading information which resulted in great financial harm and emotional distress to Taufer by the online sale of her real property located in Coral Gables, Florida, the transfer of title to the alleged Plaintiff in that foreclosure action and the illegal interruption of her monthly rental income from her rightful tenants.

2. "WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3", the alleged Plaintiff in the state court proceeding is not a Defendant or Party in this Federal action.

3. Taufer in this federal action is not complaining from injuries suffered by the summary judgment entered in the state court proceeding. She is filing this Federal lawsuit for the financial harm and emotional distress she has suffered by the fraudulent filings and illegal actions by the above-mentioned Defendants that resulted in the loss of her real property in Coral Gables, Florida and the loss of her monthly rental income from her rightful tenants.

4. This First Amended Complaint is being timely filed pursuant to the Discovery Rule and to the Equitable Tolling doctrine as evidence of fraudulent behavior by each above mentioned Defendant individually and jointly has recently been

discovered and they have individually and jointly covered up to take Taufer's real property by illegal means.

II. EVIDENCE OF FRAUDULENT BEHAVIOR BY THE FILING OF FRAUDULENT DOCUMENTS BY DEFENDANTS WAS DISCOVERED ON 04/18/2017.

1. On or approximately 04/18/2017, after a visit to the Clerk's office to review the Promissory Note, Mortgage and Assignments of Mortgage in the Clerk's file in the State Court proceeding against Taufer, it was discovered that the Promissory Note and Mortgage in the Clerk's file, cancelled by the Court on 03/19/2014, are not "Originals". They are "reduced" laser color copies of the Note and Mortgage.

2. On 03/19/2014, Defendant "Gary Gassel, P.A." with the direct supervision of also Defendant Attorney Gary I. Gassel filed "Notice of Filing" stating that the *"Plaintiff gives Notice of **Filing   Original Mortgage, Original Promissory Note** **which show an endorsement from the original lender** payable to blank and an Original Electronic Allonge from the original lender payable to Chase Home Finance, LLC and then an endorsement from Chase Home Finance, LLC, payable to Plaintiff and copy of Assignment of Mortgage the same being attached hereto a s Exhibit "A".  **The original loan documents will be hand filed by local counsel at the time of the hearing".*** Signed by attorney Gary I. Gassel, Esquire, FBN: 500690.

3. On 03/19/2014, The Note and Mortgage were "cancelled by the Clerk of Court and they both merged into the Summary Judgment entered on the same day, taking them out of the stream of commerce, losing all value they had.

4. This is "normal procedure" in every foreclosure action in the State of Florida.

5.  However, in this case the Circuit Court of Miami-Dade County, Florida was "tricked". The Original Note and Mortgage "never merged into the Summary Judgment" have never been filed and have never been "cancelled by the Court".

6.  ***The original loan documents were never hand filed by local counsel at the time of the hearing".***

7.  This information was unknown to Taufer and to me as I was not her attorney of record when the verified complaint was filed on 11/04/2010, when the Summary Judgment was entered on 03/19/2014, or when the Notice of Filing Original Note and Mortgage were filed or when the Court "cancelled" them.

MORE EVIDENCE OF BAD BEHAVIOR BY DEFENDANTS WAS DISCOVERED TO BENEFIT THE ALLEGED PLAINTIFF IN THE STATE COURT PROCEEDING AND THEIR ILLEGAL ACTIONS CAUSED GREAT FINANCIAL HARM AND EMOTIONAL DISTRESS TO TAUFER

8.  After this discovery was made, Taufer requested to review every document in the Clerk's file and compare the Promissory Note and Mortgage attached to the Verified Complaint filed on 11/04/2010, by Defendant Ben-Ezra & Katz, P.A., against the Promissory Note and Mortgage filed on 03/19/2014, attached to the Notice of Filing by Defendant attorney Gary I. Gassel, Esq, with Defendant the Law Office of Gary I. Gassel, P.A. and on behalf of the Plaintiff in that state proceed.

9.  To our surprise, "multiple inconsistencies" were discovered between the Note and Mortgage in the Clerk's file and the Note and Mortgage attached to the Complaint and this is when Taufer decided to file this Complaint for Damage in the Federal Court.

10. It was discovered that the Note attached to the Verified Complaint filed on 11/04/2010, does not have a special endorsement to a particular entity or an

endorsement in blank as stated by Defendant Gary Gassel, P.A. in his Notice of Filing Original Note and Mortgage.

11. The Note filed on 03/19/2014, just does not have any endorsement at all.

12. The Original Note and Original Mortgage were never in possession of the alleged Plaintiff when the foreclosure action was commenced.

13. However, the Complaint filed in the state court proceeding on 11/04/2010, was verified Under Penalty of Perjury by Rose C. Lara on behalf of Rushmore Loan Management, LLC, as Attorney in fact for Wells Fargo Bank, N.A. not in its Individual Capacity but Solely as Trustee for the RMAC REMIC Trust Series 2010-3, attached to the Complaint there is a True & Certified Copy of the Note but it has now been discovered that this was a "false statement".

14. This was discovered when four years, later, the Promissory Note attached to the Notice of Filing Original Note has one Undated Endorsement by Dianna Worsworthy as Assistant Secretary of JP Morgan Chase Bank, P.A. The said Endorsement does not have a date of when it was signed. It is impossible to know when exactly this endorsement was signed. For sure, it was signed AFTER the Complaint was filed.

15. This means that the alleged Plaintiff in the state court proceeding did not have Standing to Foreclose because the Promissory Note attached to the Complaint filed on 11/04/2010, is not the same Promissory Note attached to the Notice of Filing filed on 03/19/2014

16. The Circuit Court "cancelled" good quality "reduced laser color copies of the Promissory Note and Mortgage" filed by Corporate Defendant the Law Office of Gary Gassel, P.A. with the supervision of individual defendant Gary I. Gassas attorney and Individual.

17. The Original Promissory Note and Original Mortgage have not "merged into the Summary Judgment entered on 03/19/2014, in favor of the alleged Plaintiff, have not been "cancelled" by the Court yet and have not been taken out of the stream of commerce.

18. Taufer's attorney in this Federal case, Alfonso E. Oviedo-Reyes, Esq, was not her attorney at the beginning of the case in the state court proceeding when the Verified Complaint was filed on 11/04/2010, was not her attorney of record and was not present during the hearing on 03/19/2014, and did not have any way of knowing that the Promissory Note and Mortgage attached to the Notice of Filing Original Note and Mortgage and Assignment of Mortgage filed on 03/19/2014, were originals or not.

19. The copies in the docket do not reflect the "actual documents", so it is very difficult for Attorney Oviedo-Reyes or for anyone else to realize that the document showing in the docket are really reduced black and white copies in 8.00" x 11.00" format instead of the 11.00" x 14.00", original format. The Promissory Note and Mortgage in the Clerks' file is a "75.00% REDUCED to 8.00" x 11.00" HIGH QUALITY LASER COPY of the ORIGINAL NOTE AND MORTGAGE in the 11.00" x 14.00" FORMAT.

20. This discovery was made until the Note and Mortgage in the Clerk's file were reviewed.

21. The "Notice of Filing Original Note and Mortgage" by Defendant The Law Office of Gary Gassel, P.A., with the Supervision of also Defendant Attorney Gary I. Gassel, containing "Reduced Laser Color Copies of the Original Note and Mortgage and having the Circuit Court stamped "CANCELLED" is "Fraud Upon the Court", and this Honorable Court should know about it.

22. The Complaint does not have a count to Reestablish the Lost or Destroyed Note.

EVIDENCE OF MISBEHAVIOR BY COPORATE DEFENDANT "JP MORGAN CHASE BANK, N.A. AT THE CLOSING OF THE LOAN TRANSACTION ON 10/03/2007

23. It was also discovered that from the very beginning of the loan transaction, that Defendant "JP MORGAN CHASE BANK, N.A., misrepresented to be the "Lender" in the loan transaction held on 10/03/2007, as per Note and Mortgage Contract executed by and between Plaintiff Carmen Taufer and Defendant JP Morgan Chase Bank, N.A,

1. However, the HUD-1 / Settlement Agreement indicates otherwise. It states:

On line 802, Loan Discount to JP Morgan Chase Bank, N.A.:     $ 5,510.38
On line 808, Admin Fee                                        :    $    620.00
**Total Fees paid to Defendant JP Morgan              :    $ 6,130.38**

2. This is a violation of TILA.

3. JP Morgan Chase Bank, never disclosed to Taufer the name of the True Creditor, the entity that actually funded the transaction and to whom Taufer was indebted to. This information has not yet been disclosed to Taufer.

4. In summary, the Defendants in the state court proceeding acted in bad faith when Defendant JP Morgan  represented to be the "Lender" but in fact acted as a mortgage broker, when Defendant Ben-Ezra & Katz, P.A certified that the Plaintiff had possession of the Note and Mortgage at the time of the filing of the complaint but in fact they never had possession and Defendant Gary Gassel, P.A. also acted in bad faith when they tricked the Court by presenting a copy of the Note and Mortgage and not the Originals.

5.  In this case, enforcement of a "consumer debt" without having the "original note and mortgage" by a "debt collector" against Taufer (a "consumer") is a violation of the FDCPA, FCCPA, FDTUPA and other federal laws.

III.    "JURISDICTION AND PARTIES"

A. JURISDICTION AND VENUE

1.  Venue is proper in this District because all the relevant acts, transactions and events occurred within Miami-Dade County in the State of Florida, which is located within this District.

2.  Subject matter jurisdiction of this Court arises under 15 U.S.C. § 1692k(d), actionable through 28 U.S.C. § 1331 and 1337. Jurisdiction over the supplemental state law claims arise under 28 U.S.C. § 1367.

3.  The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States

4.  This Court has personal jurisdiction over the parties as all Defendants engaged in business within the State of Florida and thus have sufficient contacts.

5.  This First Amended Complaint is being timely filed pursuant to the Discovery Rule and the Equitable Tolling doctrine.

B. THE PARTIES

1. THE PLAINTIFF(S):

1. Plaintiff, "<u>CARMEN TAUFER</u>", is a natural person, over 60 years old. At all times material hereto, the Plaintiff, is "CONSUMER" as that term is defined by 15 USC 1692(a)(3), and/or a person with standing to bring a claim under the FDCPA, FCCPA by virtue of being directly affected by violations of the Act by the alleged "DEBT COLLECTOR(S)" in enforcing a "CONSUMER DEBT".

2. THE DEFENDANT(S):

1. "TAUFER" is informed and believes and based thereon such information and belief alleges that:

1.1)   Defendant "WELLS FARGO BANK, NATIONAL ASSOCIATION" (hereafter: "Wells Fargo Bank, N.A." or just "Wells Fargo") is a South Dakota corporation with its principal place of business in California, believed to be the Master Servicer, Trust Administrator and/or Custodian of the Trust. Wells Fargo & Company is a diversified financial services company. It is a Delaware corporation, headquartered in San Francisco, California. Upon information and belief, "Wells Fargo Bank, N.A." is a purchaser of performing and non-performing consumer credit debts, such as Notes and Mortgages which are in default at the time the debts are acquired. ENTITIES Collecting on defaulted debt, is itself a "debt collector," as defined under the FDCPA under 15 U.S.C. §1692a(6).
It is the "Manager" of the Trust

1.2)   Defendant "JP MORGAN CHASE BANK, NATIONAL ASSOCIATION" (Hereafter: "JP Morgan Chase Bank, N.A" or "JP Morgan"). is a national banking association. It is headquartered at; 1111 Polaris Parkway, Columbus, OH 43240. is a purchaser of performing and non-performing consumer credit debts, such as Notes and Mortgages which are in default at the time the debts are acquired. ENTITIES Collecting on defaulted debt, is itself a "debt collector," as defined under

the FDCPA under 15 U.S.C. §1692a(6).

1.3) Defendant "RUSHMORE LOAN MANAGEMENT SERVICES, LLC", is a Foreign California Corporation, It is the Loan Servicer of Taufer's loan and is actively engaged in the business of collecting debts due or alleged to be due to others. The address is 15480 LAGUNA CANYON RD, Suite 100 IRVINE, CA 92618. "Rushmore Loan Management Services, LLC", a "debt collector," as defined under the FDCPA under 15 U.S.C. §1692a(6) and it is registered as a Debt Collector in the State of Florida. Florida Collection Agency License # CCA 9901633. As such is a "debt collector" as that term is contemplated in §1692a(6) of the Act.

1.4) Defendant "BENZ-ERA & KATZ, P.A." is a Law Firm and a Dissolved Florida Corporation. The address is: 4600 Sheridan Street, Suite 305, Hollywood, FL 33021. Ben-Ezra was a "debt collector" when they filed the foreclosure action as defined by the FDCPA, 15 USC 1692a(6)

1.5) Defendant "LAW OFFICE OF GARY GASSEL, P.A,", is a Law Firm and an active Florida Corporation with its principal place of business located at: 2191 Ringling Road Sarasota, FL 34237. Gassel PA is a "debt collector" as defined by the FDCPA, 15 USC 1692a(6). Gary I. Gassel, as Employee, Partner or Principal of the Law Firm is liable for violations of FDCPA, 15 USC 1692, et al and FCCPA

1.6) Defendant "DOES 1-20, are unknown at this time but they may be added later on as this case evolves and Discoveries Requests are received.

ATTORNEYS ARE DEBT COLLECTORS AND LIABLE:
Lawyers who regularly conduct foreclosures to collect consumer debt are "debt collectors" for purposes of the FDCPA. Wilson v. Draper &Goldberg, P.L.L.C., 443 F.3d 373 (4th Cir. 2006); Kaltenbach v. Richards, 464 F. 3d 524 (5th Cir. 2006). Every Court of Appeals to have addressed the issue has held that foreclosure lawyers are subject to the FDCPA, either generally or unless they neither attempt to collect money nor enforce personal liability. Kaltenbach v. Richards, 464 F.3d 524 (5th Cir. 2006); The partnership is jointly liable for one acting as its associate or partner. – Bartlett v. Heibl, 128 F.3d 497, 499 (7th Cir.1997); Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, and Clark, LLC, 214 F.3d 872, 876 (7th Cir. 2000). General partners are liable as indirect debt collectors. Randle v. GC Services, 1998 U.S. Dist. LEXIS 16222 (N.D. Ill.). Both collection agency/employer and supervisor and offending employee are liable, West v. Costen, 558

F.Supp. 564 (W.D.Va. 1983). "Debt collectors employing attorneys or other agents to carry out debt collection practices that violate the FDCPA are vicariously liable for their agent's conduct" - Martinez v. Albuquerque Collection Services, Inc., 867 F.Supp. 1495 (D.N.M. 1994).

Under FCCPA, "[a]ny person who fails to comply with any provision of s. 559.72 is liable for actual damages and for additional statutory damages as the court may allow." Fla. Stat. Ann. §559.77. As a direct result, each Defendant individually, jointly and severally are liable for actual damage and for additional statutory damages as the court may allow.

2.   "TAUFER" is informed and believes and based thereon alleges that each Defendant is a "debt collector"  trying to collect a "consumer Debt" from a "consumer" as defined by THE FAIR DEBIT COLLECTION PRACTICES ACT, As amended by Public Law 111-203, title X, 124 Stat. 2092 (2010) 15 USC 1692a(6), 803(6), Definitions, and each defendant has engaged in an act or omission and falsehoods prohibited by the "Fair Debt Collection Practices Act" ("FDCPA"), the "Florida Consumer Collection Practices Act", ("FCCPA"),  and was at all times relevant to this complaint using instruments of interstate commerce to facilitate the collection of debts owed or asserted to be due another on behalf of the other Defendants and/or investors.

IV.   "COMMERCE"
At all times material to this Complaint, ALL "DEFENDANTS", have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

V.   "AIDING AND BETTING/CONSPIRACY"
Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to "Taufer", as alleged herein. In taking action, as alleged herein, each of the Defendants acted with an awareness of its/his/her primary

wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

VI.    FACTS COMMON TO ALL CAUSES OF ACTION:

1. The following events will provide important information to better comprehend this case:

   1) CARMEN TAUFER was the owner of the subject property since 10/03/2007, when she obtained ownership of the property via Special Warranty Deed from Urban Development 1, LLC, CFN: 2007R0989868, OR BK 25980 (Pages 3982-3984), when she purchased the "Apartment" until 05/01/2015, when the ownership of her apartment was transferred to Wells Fargo Bank, N.A. Not in its Individual Capacity but Solely as Trustee for the RMAC REMIC Trust Series 2010-3.

   2) The purchase price was $480,000.00, Taufer putting a down payment of $80,000.00.

   3) On 10/03/2007, Carmen Taufer, allegedly executed a note ("promissory note"), for $382,400.00, with Corporate Defendant "JP Morgan Chase Bank, NA".

   4) The Fixed Rate Note states on paragraph 1. BORROWER'S PROMISE TO PAY: that the **"Lender" is "JP Morgan Chase Bank, N.A.**", a bank which is organized and existing under the laws of the United States of America.

   5) The loan was secured by a Mortgage executed on the same day of 10/03/2007, in favor of "**JP Morgan Chase Bank, N.A.**" of 1111 Polaris Parkway,

Columbus, OH 43240, and recorded in the Public Records of Miami-Dade County, Florida on 10/10/207, CFN: 2007R0989869, OR Bk 25980, pages 3985-4006 (22 pages).

The Mortgage states on paragraph "(C)" "**Lender is:** "**JP Morgan Chase Bank, N.A**". Lender is a national banking association organized and existing under the laws of the United States of America. Lender address is 1111 Polaris Parkway, Columbus, OH 43240

6) On the same day 10/03/2007, Taufer was giving to sign a few closing documents consisting but not limited to: HUD-1 / Closing Statement; Truth In Lending; etc., all in "legal size paper".

The HUD-1, contains "information" that contradicts the information on the Note and Mortgage regarding the "Lender" and "creditor" Taufer would indebted to, in violation of Florida Statute §817.535 and TILA.

7) On the Note and Mortgage, Defendant "JP MORGAN CHASE BANK, N.A., misrepresented to be the "Lender" in the loan transaction held on 10/03/2007, as per Note and Mortgage Contract executed by and between Plaintiff Carmen Taufer and Defendant JP Morgan Chase Bank, N.A,

8) However, the HUD-1 / Settlement Agreement indicates otherwise. It states:

> F.  JPMorgan Chase Bank, N.A.
>     4919 Memorial Highway, Suite 308
>     Tampa, FL 33434

| | | |
|---|---|---|
| On line 802, Loan Discount to JP Morgan Chase Bank, N.A | : | $ 5,510.38 |
| On line 808, Admin Fee | : | $  620.00 |
| **Total Fees paid to Defendant JP Morgan** | **:** | **$  6,130.38** |

9) Receiving compensation on a loan transaction, proves that Defendant JP Morgan acted as a Mortgage Broker and not as a "Lender", that it earned a mortgage broker commission and as such was not the real "creditor".

10) Undisclosed to Taufer, the promissory note and mortgage were immediately pooled with other mortgages. This was done to hide the name of the true lender and creditor.

11) Undisclosed to Taufer, upon information and belief, on September 3, 2010, a Pooling and Servicing Agreement was executed creating the Trust named RMAC REMIC TRUST SERIES 2010-3 and Wells Fargo Bank, N.A. not in its individual capacity but solely as Trustee for the RMAC REMIC Trust Series 2010-3.

12) Undisclosed to Taufer, Defendants did not file in the Court a Pooling and Servicing Agreement when the foreclosure action was filed, as required but a quick search revealed that on 12/30/2007, JP MORGAN CHASE BANK, N.A. filed some documents regarding this Trust created with the SEC.

13) As a result of Taufer's promissory note and mortgage being pooled with other notes and mortgage, the newly created Trust issued "Certificates" for each loan. Each note and mortgage was cancelled by those newly issued certificates, making them null and void.

14) As of the day the note and mortgage were delivered into the pool of loans, they lost their value as they were replaced by the certificates issued by the Trust

15) The Original Note and Original Mortgage as of this date are null and void.

16) Undisclosed to Taufer, "JP Morgan" subsequently transferred/assigned its interest in the Mortgage to "Chase Home Finance, LLC" of 194 Wood Avenue, South Iselin, NJ 08830, ("Chase") (First assignment of mortgage) CFN: 2008R0751021 OR Bk 26567, pages 914-915, recorded on 09/15/2008.

17) Undisclosed to Taufer, "Chase" in turn, assigned the mortgage to Wells Fargo
Bank, N.A. *not in its individual capacity but solely as trustee for the RMAC REMIC Trust Series 2010*-3. (Second Assignment of Mortgage) CFN: 2010R0574828 OR Bk 27398, pages 1850-185, recorded on 08/25/2010

18) Both of these Assignments of Mortgage were fabricated to justify the Standing of the newly created REMIC and contain fraudulent information in violation of Florida Statute §817.535

19)   No other Assignment of Mortgage has been recorded.

20)   There is **NO** assignment of mortgage to the Trust known as**:** *RMAC REMIC Trust Series 2010*-3

21)   The Pooling and Servicing Agreement signed on 2010, is the document regulating the Trust and it was never filed with the Court.

22)   The funding of the loan contract is needed to establish consummation of the loan transaction --- i.e., without the payee having been the funding source of the loan it not only violates numerous disclosure requirements, it also reveals that there was a lack of consideration for the note and mortgage executed by the homeowners. If there is a lack of consideration between the payee on the note and mortgage, then there is no consummation because there is no contract. Basic contract law.

23)   The fact that the alleged "borrower" was duped into signing documents that named the originator as the lender is not proof that the instruments are genuine and enforceable. Such documents should never have left the "closing" table, much less be transmitted or recorded.

24)   The same holds true for alleged transfers of the loan contract. Even if there was consideration when the loan was originated and even if that consideration came from the payee on the note, in order to assert ownership over the loan the successors must offer more than a multiple choice answer to who is the owner of the loan

25)   If the Trust, as asserted by Defendant, never paid for the subject "loan" documents then at best, assuming the trust actually exists, the Trust would in actuality be "holding" the loan on behalf of some other entity or entities. If so they have not revealed it in their pleading or proposed proof. And if they did not pay for the "loan" then who did? But the even more intruding question is if they didn't pay for the "loan" why didn't the alleged assignor require payment for such a "valuable" asset? The only credible answer is that the assignor did not demand payment because it was merely performing a fee-based service in which it agreed to misrepresent itself as the assignor without a warranty of title which ordinarily would be required by any bank, large or small, if they were accepting such a document as the basis for a transaction.

Page 16 of 42

26) The plaintiff in the foreclosure action is curiously not identified except that Wells Fargo asserts it is the "trustee" for a "series." That is not the name of a Trust, nor does it actually identify for whom Wells Fargo says it is the Trustee.

In truth, Wells Fargo is most likely using the name of a fake trust in order to gain an advantage for itself. Trust law is like contract law.

**If there is no consideration there is no trust**

27) The Promissory Note attached to the Complaint does NOT show any special endorsements. The said Promissory Note was voided by the newly issued "certificates" did not have any "Special Endorsement" or "Endorsement in Blank", it does not have any endorsement / indorsement at all. Hence, the Promissory Note was never transferred and any alleged holder in due course had the burden of showing that there were endorsements in the Promissory Note that made the last holder the rightful owner of the Note as a Holder in Due Course.

28) Said Mortgage was allegedly held by Defendant WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST, SERIES 2010-3, by virtue of an assignment of mortgage recorded in Official Records Book 27398, page 1850.

29) The Mortgage may have been assigned but the Promissory Note was never endorsed, which puts all "holders" of the Mortgage at a total disadvantage because they could never execute the Mortgage if they were not legitimate holders in due course of the Note.

30) CARMEN TAUFER, as per loan servicer, Rushmore Loan Management Services, LLC, defaulted on her loan on or around 01/2010.  However, the Loan Servicer has not validated the existence of the debt, that "TAUFER" owed the debt or that they are entitled to collect monthly payments and/or to benefit from the sale of her real property;

31) As a result of the alleged Default by "TAUFER", Defendant WELLS FARGO

BANK, N.A. Trust Manager   and/or Defendant Rushmore   Loan Management  Services, LLC, Loan Servicer on or around 11/04/2010, filed a Foreclosure Action in the Circuit Court of Miami-Dade County, Florida, Case # 10-58746-CA-01-13, entitled "WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUALLY CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3", Plaintiff vs CARMEN TAUFER, Defendant(s)". (See Appendix "TEN.

32) The said Verified Complaint filed on or around 11/04/2010, by Defendant Attorney Ben-Ezra & Katz, P.A. contains "false information" in violation of Florida Statute §817.535.

The Verified Complaint states:

1. on paragraph 4. states that the "*Plaintiff holds the note and mortgage and/or received delivery of the note from the note holder for the purpose of giving Plaintiff the right to enforce the note and mortgage*" This is a False Statement: THE NOTE AND MORTGAGE WERE LOST OR DESTROYED, AND THE ALLEGED PLAINTIFF DID NOT HAVE A COUNT OF REESTABLISHMENT OF LOST OR DESTROYED NOTE

2. on paragraph 8, states:  "*There is now due, owing and unpaid to Plaintiff herein THREE HUNDRED SENVTY FIVE THOUSAND SIX HUNDRED THIRTY-SEVEN DOLLARS AND 77/100 ($375,637.77) in principal of said note and mortgage, interest as provided therein from December 1, 2009 and title search expense for ascertaining necessary parties to this suit*"

this is a False Statement: TAUFER DID NOT OWE ANY MONEY TO THIS ALLEGED PLAINTIFF.

3. on paragraph 9, states: "*Plaintiff has obligated itself to pay the undersigned attorney a reasonable fee for his services herein  both the note and mortgage provide an award of attorneys's fees incurred by Plaintiff for enforcement thereof in the   event of a default by the borrower*".

THIS IS A FALSE STATEMENT:  THE MORTGAGE CONTRACT ONLY ALLOWS PAYMENT OF ATTORNEYS' FEES IN THE APPEAL OR BANKRUPTCY COURT.

33) Non-Defendant WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3, and Defendants "BEN-EZRA & KATZ, P.A."; "MARC A. BEN-EZRA" filed a foreclosure action without having all the proper paperwork as they have done in many other cases attempting to collect a "debt" that was not legally owned by the Trustee"

34) WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3, it is not registered in New York, Florida or in any other State as a valid Trust, it does not have a physical address, it does not have any employees and it does not have any assets.

It was not the "Lender", it is not the Entity that funded this transaction, and has not suffered any financial harm from the alleged default of Carmen Taufer.

35) However, on 03/19/2014, a Summary Judgment was entered in favor of the named alleged Plaintiff.

36) On 03/19/2014, Defendant The Law Office of Gary I. Gassler, P.A. filed a Notice of Filing, stating that they were filing the Original Promissory Note and Original Mortgage

37) A copy of the said Promissory Note and a copy of the said Mortgage were "Cancelled" by the Circuit Court of Miami-Dade County, as they merged into the Summary Judgement and taken out of the stream of commerce.

38) Unknown to Taufer, Defendant Gassler did not file the Original Promissory Note and Original Mortgage. What they filed and what the Court "Cancelled was an e-Note or an e-image, high quality reduced laser color copy of the Promissory Note and Mortgage.

39) The Original Promissory Note and Mortgage are not in the file of the Clerk of

Court of Miami-Dade County, Florida.

40) On 09/19/2014, Taufer's Real Property was sold in an online foreclosure sale without the alleged Plaintiff WELLS FARGO BANK, N.A. NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3, complying with F.S. 48.031

41) On 09/23/2014, a Certifcate of Sale is entered by the Clerk, certifying that Taufers' property had been sold to the Plaintiff "WELLS FARGO BANK, N.A." who was never the Plaintiff.

42) Defendants The Law Office of Gary I. Gassler committed fraud on the Court by the filing of the Notice of Filing Original Note and Mortgage and filing copies instead in clear violation of  Florida  Statute 817.535.

43) Defendants violated the FDCPA of §1692e (2)(a) and 1692e(10) multiple times for the false representation of the character, intent of the lawsuit, amount, or legal status of a debt that was never verified by the Defendants.


## FIRST CAUSE OF ACTION

(Against Defendants "Wells Fargo", "Rushmore", "Gary Gassel, P.A". "attorney Gary Gassel", "Ben-Ezra & Katz, P.A"., and "attorney Marc A. Ben-Ezra")

### violation of Florida Criminal Code §817.535; *Unlawful filing of false documents or records against real or personal property*

Section 817.535, Florida Statutes, became effective October 1, 2013. See s. 1, ch. 2013-228, Laws of Florida. It is now a third degree felony to file in the public records any instrument containing a materially false, fictitious, or fraudulent statement or representation that purports to affect an owner's interest in property with the intent to defraud or harass another.

1. "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph.

2. On or around 04/18/2017, was discovered that the Promissory Note and Mortgage in the Clerk's file, cancelled by the Court on 03/19/2014, are not "Originals". They are "reduced" laser color copies of the Note and Mortgage.

3. On 03/19/2014, Defendant "Gary Gassel, P.A." with the direct supervision of also Defendant Attorney Gary I. Gassel filed "Notice of Filing" stating that the *"Plaintiff gives Notice of **Filing   Original Mortgage, Original Promissory Note** **which show an endorsement from the original lender** payable to blank and an Original Electronic Allonge from the original lender payable to Chase Home Finance, LLC and then an endorsement from Chase Home Finance, LLC, payable to Plaintiff and copy of Assignment of Mortgage the same being attached hereto a s Exhibit "A".  **The original loan documents will be hand filed by local counsel at the time of the hearing".** Signed by attorney Gary I. Gassel, Esquire, FBN: 500690.

4. ***The original loan documents were never hand filed by local counsel at the time of the hearing".***

24. It was also discovered that the Note attached to the Verified Complaint filed on 11/04/2010, does not have a special endorsement to a particular entity or an endorsement in blank as stated by Defendant Gary Gassel, P.A. in his Notice of Filing Original Note and Mortgage.

25. The Note filed on 03/19/2014, just does not have any endorsement at all.

26. The copies in the docket do not reflect the "actual documents", so it is very difficult for Attorney Oviedo-Reyes or for anyone else to realize that the document showing in the docket are really reduced black and white copies in 8.00" x 11.00" format instead of the 11.00" x 14.00", original format. The Promissory Note and Mortgage in the Clerks' file is a "75.00% REDUCED to

8.00" x 11.00" HIGH QUALITY LASER COPY of the ORIGINAL NOTE AND MORTGAGE in the 11.00" x 14.00" FORMAT.

27. This discovery was made until the Note and Mortgage in the Clerk's file were reviewed.

28. The "Notice of Filing Original Note and Mortgage" by Defendant The Law Office of Gary Gassel, P.A., with the Supervision of also Defendant Attorney Gary I. Gassel, containing "Reduced Laser Color Copies of the Original Note and Mortgage and having the Circuit Court stamped "CANCELLED" is "Fraud Upon the Court", and this Honorable Court should know about it.

29. The Complaint does not have a count to Reestablish the Lost or Destroyed Note.

30. As a direct result of the new discovery, the following documents that have been filed in Court are fraudulent or contain fraudulent information:

   a. The Note and Mortgage in the Clerk's file filed on 03/19/2014, are reduced laser color copies and not orginals and must be nullified and voided by this Court.
   b. As a direct result of this discovery, the Complaint filed on 11/04/2010, contain false information because the alleged Plaintiff never had possession of the original note and mortgage and it is different from the Note and Mortgage filed on 03/19/2014 and must be nullified and voided by this Court.

   c. The Certificate of Title issued by the Clerk on 05/01/2015, was obtained using fraudulent documents and must be nullified and voided by this Court.

31. Please see attached copy of the Verified Complaint filed on 11/04/2010, the Note attached to the Verified Complaint and the Notice of Filing Original Note and Mortgage 03/19/2014, as "Original Note and Original Mortgage" marked as Exhibit "ONE"). One can see with a naked eye that the note is a reduced laser color copy in an 11'x14' format and that both notes filed are

Page 22 of 42

different.  The first one file does not have any endorsement and the second one filed has endorsements.

32. As a direct proximate result of the negligence and carelessness  above mentioned Defendant as set forth above, "Taufer" suffered:

1. General and special damage in the amount of $480,000.00, for Defendant's having executed a Promissory Note for which they did not have an original and foreclosed the Mortgage that secured the Note that they executed, where they did not have a valid debt to collect and did so by filing fake documentation instead of the ORIGINAL DOCUMENTS.

2. Punitive Damages as the Defendants acted with malice and showed their evil intent in the manner in which they conducted their actions in the trial in which they executed a Promissory Note of which they were not the rightful owners as they did not have the original of the Note. As a result they owe the Plaintiff nine times the actual damages that the Plaintiff Taufer has sustained from each Defendant in the said amount to be determined at trial, plus all the monies that she paid to the agents of the Plaintiff in monthly payments towards a Note that they did not hold lawfully which amount will be establish at the trial from each Defendant

33. Attorney's Fees to be determined at trial

## SECOND CAUSE OF ACTION

**(Against Defendants "Wells Fargo", "Rushmore" , "Gary Gassel, P.A". "attorney Gary Gassel", "Ben-Ezra & Katz, P.A"., and "attorney Marc A. Ben-Ezra")**

### 15 U.S. Code § 1692e - False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section.
(2) The False Representation of: (A) The character, amount or legal status of any debt.

1. "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph.

2. The discovery made on 04/18/2017, as explained in the first cause of action above, that the Note and Mortgage in the clerk's file are not "Originals", that the Note attached to the Verified Complaint is different from the Note filed as "original" on 03/19/2014, makes the said Note and Mortgage invalid and uncollectable. The collection of an "invalid note and mortgage" by an entity that never owned it is a violation of the FDCPA, FCCPA and other Federal Laws.

3. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
   4. Court Cost and Mailing Expenses: $1,000.00
   5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

**"THIRD CAUSE OF ACTION"**
(Against "Wells Fargo Bank" and "Rushmore"")

**"NEGLIGENCE"**

1. "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph

2. At all times herein, Defendants "Wells Fargo Bank, N.A.", as Trust Manager and/or Trustee; "RUSHMORE", as Loan Servicer of "Taufer's loan and each had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents

attendant to the maintenance, accounting and servicing of loan records, including but not limited, accurate crediting of payments made by Plaintiff.

3. In taking the actions alleged above, and in failing to take the actions as alleged above, the foreclosing Defendant breached their duty of care and skill to Plaintiff in the servicing of Plaintiff's loan, by among other things, failing to properly and accurately supervise the preparation and filing of false documents and foreclosing on the subject property without having legal authority and/or proper documentation to do so.

4. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   6. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   7. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   8. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
   9. Court Cost and Mailing Expenses: $1,000.00
   10. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

### FOURTH CAUSE OF ACTION
(Against Corporate Defendant JP Morgan Chase Bank, N.A.)

"Violations of § 1692e (communicating information which is known to be false"
Violation of 15 USC 1692e § 807(2)(a) False or Misleading Representations

1. "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph.

2. Defendant "JP MORGAN CHASE BANK, N.A., misrepresented to be the "Lender" in the loan transaction held on 10/03/2007, as per Note and Mortgage Contract executed by and between Plaintiff Carmen Taufer and Defendant JP Morgan Chase Bank, N.A, However, the HUD-1 / Settlement Agreement

indicates otherwise. (see attached HUD-1). It indicates that JP Morgan was a Mortgage Broker and not the "Lender" and earned a mortgage broker commission It states:

On line 802, Loan Discount to JP Morgan Chase Bank, N.A.:     $ 5,510.38

On line 808, Admin Fee                                           :    $   620.00

**Total Fees paid to Defendant JP Morgan          :     $ 6,130.38**

3.  As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

1.  General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
2.  Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
3.  Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
4.  Court Cost and Mailing Expenses: $1,000.00
5.  Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

**"FIFTH CAUSE OF ACTION"**
(Against Defendants Rushmore Loan Management Services, LLC and
the Law Office of Benz-Era & Katz, P.A.)

**"Violation of U.S. 15 U.S.C 1692g"**
**"Failure to provide written "Debt Validation Notice'**

**The Defendant's notice of Debt Validation was "deceptive," in violation of
15 U.S.C. § 1692e(10).**

1.  "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph

2.  Defendant Rushmore as Loan Servicer and the Law Office Ben-Ezra & Katz, PA, failed to send a valid written "Debt Validation Notice

3. <u>The Fair Debt Collection Practices Act (FDCPA)</u> mandates that as part of noticing a debt, a debt collector must send the <u>consumer</u> a written notice containing — along with other information – "the name of the creditor to whom the debt is owed." This requirement is sometimes referred to as the "Debt Validation Notice." In addition, the Act prohibits a "debt collector" from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

4. A debt collector's communication violates § 1692e of the FDCPA if it would be deceptive to the "least-sophisticated consumer." LeBlanc v. Unifund CCR Partners, 601 F. 3d 1185, 1194 (11th Cir. 2010).

5. A notice attached to a foreclosure complaint may deceive the least-sophisticated consumer when it misidentifies the consumer's creditor and incorrectly implies that the consumer must dispute his or her debt in writing. See Johnstone v. Aldridge Connors, LLP, No. 13-61757-CIV, 2013 WL 6086049, at *3 (S.D. Fla. Nov. 20, 2013). In the present case, Plaintiffs allege that the notice contained two false representations.

6. A debt collector must only provide a notice after an "initial communication" with a consumer.

7. In this case, Rushmore, as Loan Servicer should have sent a "Debt Validation Notice" to "Taufer", prior to the filing of the foreclosure action on 11/04/2010.

8. Instead, the Notice the Complaint filed by Marcel Flemming, FBN: 41001, with the Law Offices of Benz-Era & Katz, P.A., did not include said Debt Validation Notice, he added a paragraph Notice Required by the Fair Debt Collection Practices Act which does not comply with the Act.

9. The said Notice states that "Unless you dispute the validity of this debt or any portion thereof within 30 days after receipt of this notice, the debt will be assumed

to be valid.  If you notify this office within the 30 day period that the debt or any portion thereof is disputed, we will obtain verification of the debt and a copy of the verification will be mailed to you.  (We will suspend our collection efforts until we have provided information to you.)  Upon your written request within the 30 day period we will provide you with the name and address of the original creditor, if different from the current creditor.

10. A recent case filed in United States District Court in Orlando, Florida, alleges that Shapiro, Fishman & Gache, LLP, acting as counsel for PHH Mortgage Corporation, filed a complaint in Seminole County, Florida, to foreclose on Linda Karp's mortgage and to enforce a promissory note. Attached to the state court complaint and summons was a document entitled "Notice Required by the FDCPA, 15 U.S.C. Section 1692g." The Notice was presumably served to inform Linda Karp of her rights concerning validation of the debt and provide her with 30 days to request validation of the debt. The summons issued by the court along with the foreclosure complaint informed Karp that she had 20 days to file a response with the court. Karp sued Shapiro, Fishman & Gache, LLP under the FDCPA alleging that the firm violated the Act because the Notice attached to the state court Complaint was deceptive and misleading to the "least sophisticated consumer." The lawsuit alleges that the "least sophisticated consumer" could be deceived or confused when the summons sets out a 20-day deadline to respond to the lawsuit and the attached notice provides for a 30-day deadline to request validation of the debt. Karp further alleged that hundreds of other consumers received the identical notice in connection with their mortgage foreclosure lawsuit. Karp v. Shapiro, Fishman & Gache, LLP, Case Number: 6-14-Civ-Orl-000046-28TB

11. The Sixth Circuit decided that a law firm could be liable, under the Fair Debt Collection Practices Act ("FDCPA"), for stating the wrong identity of the mortgage owner in a foreclosure complaint. This latest case strongly suggests that misstatements in a foreclosure complaint, and presumably other court filings, subject not only the plaintiff's attorney to the FDCPA, but the loan servicer client as well.

12. Recently, in Caprio v. Healthcare Revenue Recovery Group LLC 1, the Third Circuit clarified the law on validation notices required under the Fair Debt Collection Practices Act (FDCPA), emphasizing that debt collectors must not only adhere to technical statutory requirements, but they must also effectively convey such notice to unsophisticated consumers.

13. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
   4. Court Cost and Mailing Expenses: $1,000.00
   5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## SIXTH CAUSE OF ACTION
(Against Rushmore Loan Management Services, LLC, Wells Fargo Bank, N.A.,  The  Law Office of Gary  Gassler, P.A., Attorney  Gary I. Gassler and Individual Gary  I. Gassler)

## ILLEGAL BIDDING AT FORECLOSURE AUCTION

   1. "TAUFER" incorporates herein by reference the allegations made in all paragraphs above, inclusive, as though fully set forth herein.

2. The alleged Plaintiff in that state court proceeding was: "WELLS FARGO BANK, N.A. NOT I N ITS INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3. THIS IS THE ONLY PLAINTIFF NAMED IN THE COMPLAINT

3. Defendant "WELLS FARGO BANK, N.A". was not and has never been the Lender, Creditor or the entity that funded the transaction on 10/03/2007.

4. Defendant "WELLS FARGO BANK, N.A.", is not and has never been the loan servicer of Taufer's Note and Mortgage in that foreclosure action in the state court

5. However, at the foreclosure auction held on 09/18/2014, Defendant "WELLS FARGO BANK, N.A.", NON-PLAINTIF AND NON-PARTY, made a bid to purchase Taufer's property without putting the 5.00% deposit required and won the bid resulting in purchasing the property for the ridiculous amount that shocks the conscience of $20,100.00.

6. Defendant "WELLS FARGO BANK, N.A". is not and has never owned the promissory note and mortgage.

7. Defendant "WELLS FARGO BANK, N.A". is not and has never been the owner of the apartment.

8. Defendant "WELLS FARGO BANK, N.A".  is not and has never been the Plaintiff in the  foreclosure action but is the entity that made the highest bid on the online foreclosure action held on 09/18/2014.

9. As a result, "Taufer" has suffered and continues to suffer considerable financial damages and Emotional Distress.

10. At all times herein, Defendants "Rushmore Loan Management Services, LLC", acting as Loan Servicer, "Wells Fargo Bank,  N.A.", acting as the Guardian, "The  Law Office of Gary  Gassel, P.A.", "Attorney  Gary I.

Gassel" and Individual Gary I. Gassel" acting as Attorneys had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including but not limited, accurate crediting of payments made by Plaintiff.

11. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

6. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
7. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
8. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
9. Court Cost and Mailing Expenses: $1,000.00
10. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## SEVENTH CAUSE OF ACTION
(Against Wells Fargo, Rushmore, Ben-Ezra & Katz, P.A., Attorney Marc A. Ben-Ezra, Gary Gassel, P.A., Attorney Gary I. Gassel)

## SLANDER OF TITLE

1. "TAUFER" incorporates herein by reference the allegations made in all paragraphs above, inclusive, as though fully set forth herein.

2. The actions stated herein and carried out by the defendants mentioned above has caused to be recorded various documents including a Notice of Judicial Sale, a Certificate of Title which has impaired the Consumers' title which constitutes slander of title and the Consumer TAUFER should be awarded resulting damages to be fully proved at the time of trial.

3. WELLS FARGO BANK, N.A. as Trustee, was not the creditor, did not fund the transaction and has not suffered any damage as the result of the alledged default by Taufer.

4. WELLS FARGO BANK, N.A., as Trustee, was not and has never been the Plaintiff in this foreclosure action.

5. WELLS FARGO BANK, N.A. as Trustee never suffered any financial harm from Taufer being in default.

6. Defendant "WELLS FARGO BANK, N.A".  is not and has never been the Plaintiff in the  foreclosure action but is the entity that made the highest bid on the online foreclosure action held on 09/18/2014.

7. As a result, "Taufer" has suffered and continues to suffer considerable financial damages and Emotional Distress.

8. At all times herein, Defendants "Rushmore Loan Management Services, LLC", acting as Loan Servicer, "Wells Fargo Bank,  N.A.", acting as the Guardian, "The Law Office of Gary  Gassel, P.A.", "Attorney  Gary I. Gassel" and Individual Gary I. Gassel" acting as Attorneys had a duty to exercise reasonable care and skill to maintain proper and accurate loan records and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including but not limited, accurate crediting of payments made by Plaintiff

9. In taking the actions alleged above, and in failing to take the actions as alleged above, the foreclosing Defendant "Rushmore", breached their duty of care and skill to Plaintiff in the servicing of Plaintiff's loan, by among other things, failing to properly and accurately credit payments made by Plaintiff towards her loan, preparing and filing false documents and foreclosing on the subject property without having legal authority and/or proper documentation to do so.

10. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
4. **Court Cost and Mailing Expenses: $1,000.00**
5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## EIGHTH CAUSE OF ACTION"
(Against each and all Defendants)

"DEFENDANT'S VIOLATIONS OF THE FLORIDA CONSUMER COLLECTIONS PRACTICES ACT 559.72, (FCCPA) AND THE FAIR DEBT COLLECTION PRACTICES ACT (F.D.C.P.A.), 15 U.S.C. §§1692e §807(11)

### FALSE AND MISLEADING REPRESENTATIONS

1. "TAUFER" incorporates herein by reference the allegations made in all paragraphs above, inclusive, as though fully set forth herein.

2. Before 1986, MBSs had various tax-related inefficiencies. Most importantly, these securities were taxable at the entity level, so investors faced double taxation. Wall Street firms successfully lobbied Congress to eliminate double taxation in 1986. This legislation created the REMIC, which is not taxed at the entity level. This one change automatically boosted REMIC yields over other forms of MBSs that would still be taxed. Unsurprisingly, REMICs larglely displaced these other types of MBSs and soon became the dominant choice of entity for such transactions.

3. A REMIC allows for the pooling of mortgage loans that can then be issued as multiple-tranche MBSs. A REMIC is intended to be a passive investment

Page 33 of 42

in a static pool of mortgages. Because of its passive nature, a REMIC is limited on how and when it can acquire mortgages. In most cases, a REMIC must acquire its mortgages within three months of its start-up. IRC § 860G(a)(3)(ii), (9). The IRC contains draconian penalties for REMICs that fail to comply with applicable legal requirements, the "REMIC

4. Wells Fargo Bank, N.A. as Trustee did not comply with the IRC§ 860G(a)(3)(ii), made believe the circuit court they did and as a result went on to collect a consumer debt that was not valid and did not legally owned

5. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
   4. Court Cost and Mailing Expenses: $1,000.00
   5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## "NINETH CAUSE OF ACTION"
### (Against each and all Defendants)

## "VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FS 501.201 (HEREAFTER "FDUTPA)"

1. "TAUFER" incorporates herein by reference the allegations made in all paragraphs above, inclusive, as though fully set forth herein.

2. The actions stated herein and carried out by the defendants collectively known as "WELLS FARGO BANK, N.A." in the enforcement of a note that was never validated, using a summary judgment that did not comply with Florida Statute

55.10, were violations of Florida State and Federal Law, and are therefore unfair and/or deceptive trade practices as defined by state statute 501.203 (3).

3. Unfair and/or deceptive trade practices are a violation of the Florida Deceptive and Unfair Trade Practices Act pursuant to 501.204 (1).

4. As a result, "TAUFER" has suffered and continues to suffer considerable financial damages and Emotional Distress.

5. WHEREFORE, "TAUFER" requests relief as hereinafter set forth below:

## TENTH CAUSE OF ACTION"
(Against each and all Defendants)

VIOLATION OF THE CONSUMER PROTECTION ACT

1. "TAUFER" incorporates herein by reference all of the allegations made in all the above

   paragraphs as though fully set forth herein.

2. The defendants have engaged in a pattern of unfair practices in violation of the Florida Consumer Protection Act, FCCPA, entitling the Consumers to damages, treble damages and reasonable attorney fees and costs pursuant to the statute.

3. As a result, "TAUFER" has suffered and continues to suffer considerable financial damages and Emotional Distress.

4. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00

4. Court Cost and Mailing Expenses: $1,000.00
5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## "ELEVENTH  CAUSE OF ACTION"
(Against Defendant Rushmore Loan Management Services, LLC and
the Law Offices of Gary I. Gassel, Esq"

### Violation of 15 USC 1692e(10) § 807(2)(a)

### False or Misleading Representations

### "Illegal Collection of Fees not authorized in the Mortgage Contract"

1. "Taufer" incorporates herein by reference all the allegations made above, inclusive of this paragraph.

2. Defendant Rushmore as Loan Servicer, misrepresented the amounts owed by "Taufer in different ways

3. The collector cannot misrepresent the amount you owe. [15 USC 1692e] § 807(2)(a)

**Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10),** prohibits debt collectors from using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.
In numerous instances, in connection with the collection of debts, Defendant, directly or indirectly, through the means described has used false representations or deceptive means to collect or attempt to collect debts or to obtain information about consumers.

4   The Summary Judgment entered on 03/19/2014, against "Taufer" states on paragraph 1. Amounts Due and Owing:

Attorneys' Fees Total          $4,675.00

5   As per Mortgage Contract, on paragraph 24, it states:

Paragraph 24. Attorneys' Fees.  *As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellant court and any attorneys' fees incurred in a bankruptcy proceeding.*

6   The foreclosure action never made it to the bankruptcy Court or the Appellate Court. Therefore, this is a fee charged in violation of the mortgage contract

7   Defendant's representations as set forth constitute false representations

deceptive means in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10).

14. As a direct proximate result of the negligence and carelessness of Defendant Rushmore as set forth above, "Taufer" suffered general and special damage in the amount of $4,675.00 + $480,000.00, for Defendant's failure to comply with FDCPA, 1692e

15. As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

   1. General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
   2. Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
   3. Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00
   4. Court Cost and Mailing Expenses: $1,000.00
   5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

## TWELVETH  CAUSE OF ACTION"
### (Against each and all Defendants)

### "INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS"

1.  "TAUFER" incorporates herein by reference all of the allegations made in all the above paragraphs as though fully set forth herein.

2.  The defendants have engaged in a pattern of unfair practices in violation of the Florida Consumer Protection Act, FCCPA, entitling the Consumers to damages, treble damages and reasonable attorney fees and costs pursuant to the statute.

3.  Defendant intended to and did inflict severe emotional distress upon Plaintiff byengaging in actions that intended to harass, belittle, confuse, mislead and threaten the Plaintiff, the purpose of which was to intimidate and coerce the Plaintiff into paying a debt which was not legitimately owed, and conspired to systematically deny the Plaintiff her right to dispute the legitimacy and validity of a claimed debt.

4.  Defendants attempted to take advantage of a consumer reasonably unable to protect his interests because of an assumed ignorance and an inability to understand the legal issues and other factors involved, and therefore acted with unconscionable intent.

5.  The defendants have intentionally or negligently taken actions which have caused the plaintiffs severe emotional distress.

6.  As a result, "TAUFER" has suffered and continues to suffer considerable financial damages and Emotional Distress.

7.  As a direct proximate result of the negligence and carelessness of above mentioned Defendant as set forth above, "Taufer" suffered:

    1.  General and special damage in the amount of $480,000.00, for Defendant's failure to comply with FDCPA.
    2.  Statutory Damages under FDCPA, from each Defendant in the amount of $1,000.00
    3.  Statutory Damages under FCCPA, from each Defendant in the amount of $2,000.00

4. Court Cost and Mailing Expenses: $1,000.00
5. Punitive Damage from each Defendant in the amount of $4,850,000.00 from each Defendant

CONCLUSION:

Federal Plaintiff Carmen Taufer is not a sole loser in the state court proceeding and she is not complaining about injuries suffered from the summary judgment entered on 03/19/2014.

Taufer is filing this First Amended Complaint in Federal Court against five Defendants that were not Parties in the state court proceeding, for their illegal and fraudulent actions in the filing of fraudulent documents or documents containing fraudulent information that affect the records of her real property in violation of Florida Statute 817.535 and when they proceeded to collect a "consumer debt" based on fraudulent documents (a cancelled electronic image, reduced laser color copy of the note and mortgage), against a "consumer", by "debt collectors", as each defendant is a debt collector, then it became violations of FDCPA, and FCCPA.

Taufer is seeking compensation for their illegal activities.

PRAYER FOR RELIEF

Plaintiff, "CARMEN TAUFER" pursuant to FDCPA 1692 and FCCPA, requests that the Court:

1. Enter Judgment against each Defendant and in favor of "CARMEN TAUFER for each violation alleged in this Complaint as stated on each cause of action.

2. Award such relief as the Court finds necessary to redress injury to consumers resulting from the Defendant's violations of the FDCPA, FCCPA, including but not limited, to the refund of actual damages, monies paid

Page 39 of 42

3. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper

4. <u>STATUTORY DAMAGES</u>:
   Additional Statutory damages under FDCPA for $1,000, and $2,000.00, under FCCPA, to TAUFER, paid by each Defendant on each Cause of Action as stated.

5. "TAUFER" also seek $550,000 in actual damages for Emotional Distress to compensate for her emotional distress for the loss of her apartment due to a foreclosure action filed without having the correct paperwork, filed on behalf of a Plaintiff that had not validated the Debt, and has not validated that the Debt is owed by TAUFER.

   A plaintiff may recover actual damages for emotional distress under the FDCPA and FCCPA. *Minnifield v. Johnson & Freedman, LLC,* 448 F. App'x 914, 916 (11th Cir.2011) (finding that a plaintiff can recover for emotional distress under the FDCPA); *Fini v. Dish Network L.L.C.,* 955 F.Supp.2d 1288, 1299 (M.D.Fla.2013) (finding the same under the FCCPA).

   "Emotional distress must have a severe impact on the sufferer to justify an award of actual damages."*Alecca v. AMG Managing Partners, LLC,* No. 3:13–CV–163–J–39PDB, 2014 WL 2987702, at *2 (M.D.Fla. July 2, 2014).

## PUNITIVE DAMAGES

In addition to statutory and actual damages, "TAUFER" requests two million dollars from each Defendant in punitive damages under the FCCPA. The Court may award punitive damages under the FCCPA. Fla. Stat. § 559.77.

Punitive damages under the FCCPA, *see, e.g., Crespo v. Brachfeld Law Grp.,* No. 11–60569–CIV, 2011 WL 4527804, at *6 (S.D.Fla. Sept.28, 2011); *but see Alecca,* 2014 WL 2987702, at (finding unpersuasive the plaintiff's argument that behavior that had no excuse was equated with malicious intent).

"TAUFER" argues that punitive damages are appropriate where the defendant acted with malicious intent, meaning that it did a wrongful act "to inflict injury or without a reasonable cause or excuse."(Doc. 100–1 at 18) (quoting Story v. J.M. Fields, Inc., 343 So.2d 675, 677 (Fla.Dist.Ct.App.1977). Bank of America likewise cites this standard (Doc. 101 at 16), as have a number of courts that considered punitive damages under the FCCPA, see, e.g., Crespo v. Brachfeld Law Grp., No. 11–60569–CIV, 2011 WL 4527804, at *6 (S.D.Fla. Sept.28, 2011); but see Alecca, 2014 WL 2987702, at *1 (finding unpersuasive the plaintiff's argument that behavior that had no excuse was equated with malicious intent).

Punitive damages, which is now limited by the U.S. Supreme Court to nine times ("single digit") the amount of the actual damages "TAUFER" can prove at trial. Accordingly, "TAUFER" can show $500,000 in actual damages, "TAUFER" would be entitled to a maximum amount of punitive damages equal to $4,850,000

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of each and every claim so triable.

Respectfully submitted this 31[th] day of October, 2017, by


S./Alfonso E. Oviedo
**ALFONSO OVIEDO-REYES, ESQ.**
Attorney for the Plaintiff Carmen Taufer
Florida Bar # 0478172
8370 W. Flagler Street, Suite 110
Miami, Florida 33144
Phone: (305) 221-6433 /Fax: (305) 221-6519.
Email: oviedo13@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by personal delivery on this 31st day of October, 2017, to all counsel or parties of record on the attached Service List below.

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT OF FLORIDA IN AND FOR
MIAMI-DADE COUNTY
GENERAL JURISDICTION DIVISION
CASE NO.

WELLS FARGO BANK, N.A., NOT IN ITS
INDIVIDUAL CAPACITY BUT SOLELY AS
TRUSTEE FOR THE RMAC REMIC TRUST,
SERIES 2010-3,
      Plaintiff,

10 - 58746 CA 13

vs.

**VERIFIED COMPLAINT**

CARMEN TAUFER; UNKNOWN SPOUSE OF
CARMEN TAUFER; STORMPROOF
WINDOWS & DOORS INC./PUERTA DE
PALMAS CONDOMINIUM ASSOCIATION,
INC.; UNKNOWN TENANT #1; UNKNOWN
TENANT #2,
      Defendants.

_____

Plaintiff, WELLS FARGO BANK, N.A., NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY

AS TRUSTEE FOR THE RMAC REMIC TRUST, SERIES 2010-3, sues Defendants named in the

caption hereof and alleges:

## COUNT I

### FORECLOSURE OF MORTGAGE

    1.     This is an action to foreclose a mortgage on real property in MIAMI-DADE County,
Florida.

    2.     On October 3, 2007, CARMEN TAUFER, executed and delivered a promissory note to
JPMORGAN CHASE BANK, N.A..

    3.     On that same day, CARMEN TAUFER, executed and delivered a mortgage securing
payment of said promissory note to JPMORGAN CHASE BANK, N.A., which mortgage was recorded
on October 10, 2007 in Official Records Book 25980, Page 3985  of the Public Records of MIAMI-
DADE County, Florida.  Said mortgage is presently held by WELLS FARGO BANK, N.A., NOT IN ITS
INDIVIDUAL CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST, SERIES
2010-3, by virtue of assignment of mortgage recorded in Official Records Book 27398, Page 1850,
which mortgaged the property described therein, then owned by and in possession of said mortgagor,
copies of said note, mortgage and assignment of mortgage being attached hereto, as exhibit "A".

    4.     Plaintiff holds the note and mortgage and/or received delivery of the note from the note
holder  for the purpose of giving Plaintiff the right to enforce the note and mortgage.




Said property is now owned by Defendants, CARMEN TAUFER.

There has been a default under the note and mortgage held by Plaintiff in that the ient due January 1, 2010, and all subsequent payments have not been made.

7.      Plaintiff declares the full amount due under said note and mortgage to be now due.

8.      There is now due, owing and unpaid to Plaintiff herein THREE HUNDRED SEVENTY-FIVE THOUSAND SIX HUNDRED THIRTY-SEVEN DOLLARS AND 77/100 ($375,637.77) in principal of said note and mortgage, interest as provided therein from December 1, 2009 and title search expense for ascertaining necessary parties to this suit.

9.      Plaintiff has obligated itself to pay the undersigned attorney a reasonable fee for his services herein. Both the note and the mortgage provide for an award of attorney's fees incurred by Plaintiff for enforcement thereof in the event of a default by the borrower.

10.      All conditions precedent to the filing of this action have been performed or have occurred.

11.      As Spouse of the property owner, UNKNOWN SPOUSE OF CARMEN TAUFER may claim a homestead or other interest in the property being foreclosed. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed.

12.      Unknown Tenant #1 may claim an interest in the property. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed.

13.      Unknown Tenant #2 may claim an interest in the property. Any such interest is subordinate and inferior to the lien of the mortgage being foreclosed.

14.      The Public Records of MIAMI-DADE County Florida, Book 26215, Page 2849 and Book 27336, Page 1529, disclose lien which are presently held by STORMPROOF WINDOWS & DOORS INC. which liens encumbers the subject property. Any interest the subject property inuring to STORMPROOF WINDOWS & DOORS INC. is subordinate and inferior to the lien of the mortgage being foreclosed herein.

15.      PUERTA DE PALMAS CONDOMINIUM ASSOCIATION, INC. may claim an interest in the subject property by virtue of its status as a condominium association. Any interest in the subject property inuring to PUERTA DE PALMAS CONDOMINIUM ASSOCIATION, INC. is subordinate and inferior to the lien of the mortgage being foreclosed herein, subject only to the provisions of Fla. Stat. 718.116

16.      The mortgage being foreclosed is a purchase money mortgage and is superior to the prior recorded interests of those defendants named herein. Schilling v. Bank of Sulphur

147 So. 218 (Fla. 1933); Sarmiento v. Stockton, Whatley, Davin & Co., 399 So. 2d 1057
d DCA 1981).

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage and such other relief as is just and proper in the premises.

> Ben-Ezra & Katz, P.A.
> Attorneys for Plaintiff
> 2901 Stirling Road, Suite 300
> Fort Lauderdale, Florida  33312
> Telephone: (305) 770-4100
> Fax: (305) 653-2329
>
> BY: _____
> Marcel Flemming
> Fla. Bar No. 41001

### Notice Required by the Fair Debt Collection Practices Act

Unless you dispute the validity of this debt or any portion thereof within 30 days after receipt of this notice, the debt will be assumed to be valid.  If you notify this office within the 30 day period that the debt or any portion thereof is disputed, we will obtain verification of the debt and a copy of the verification will be mailed to you. (We will suspend our collection efforts until we have provided this information to you.) Upon your written request within the 30 day period we will provide you with the name and address of the original creditor, if different from the current creditor.

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT OF FLORIDA IN AND FOR
MIAMI-DADE COUNTY
GENERAL JURISDICTION DIVISION
CASE NO.

10 - 58746 CA13

WELLS FARGO BANK, N.A., NOT IN ITS
INDIVIDUAL CAPACITY BUT SOLELY AS
TRUSTEE FOR THE RMAC REMIC TRUST,
SERIES 2010-3,
     Plaintiff,

vs.

CARMEN TAUFER; UNKNOWN SPOUSE OF
CARMEN TAUFER; STORMPROOF
WINDOWS & DOORS INC.; PUERTA DE
PALMAS CONDOMINIUM ASSOCIATION,
INC.; UNKNOWN TENANT #1; UNKNOWN
TENANT #2,
     Defendants.

_____

## FLA. R. CIV. P. 1.110(b) VERIFICATION

"Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged
therein are true and correct to the best of my knowledge and belief."

Rushmore Loan Management Services LLC, As Attorney-in-fact for
Wells Fargo Bank N.A., not in its individual capacity but solely
as Trustee for the RMAC Remic Trust, Series 2010-3

Printed name: _Rose C. Lara_

VBS

True & Certified Copy

# NOTE

October 3, 2007                    Coral Gables                              FL
       (Date)                          (City)                              (State)

888 S Douglas Rd #1502
Coral Gables, FL 33134
                                   (Property Address)

**1. BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $382,400.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
JPMorgan Chase Bank, N.A.
a bank which is organized and existing under the laws of the United States of America.
    I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of 8.500      %.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

**3. PAYMENTS**
    **(A) Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payment on the First      day of each month beginning on November 1st 2007        . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on October 1, 2037        , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."
    I will make my monthly payments at JPMorgan Chase Bank, N.A., c/o Chase Home Finance, LLC
3415 Vision Drive, Columbus, OH 43219                               or at a different place if required by the Note Holder.

    **(B) Amount of Monthly Payments**
    My monthly payment will be in the amount of U.S. $ 2,940.33

**4. BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
    I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

1742880722

FLORIDA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT



-6N(FL) (0005)                    Form 3210 1/01
    VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                       Initials:



**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen**        calendar days after the date it is due. I will pay a late charge to the Note Holder. The amount of the charge will be $ **5.000**          % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
                    -Borrower   Carmen Tauffer                       -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

*[Sign Original Only]*

1742880722

-5N(FL) (0005)                    Page 3 of 3                    Form 3210 1/01

IN THE CIRCUIT COURT OF THE 11ᵗʰ JUDICIAL CIRCUIT
IN AND FOR **MIAMI-DADE** COUNTY, FLORIDA.
**CIVIL DIVISION**

**WELLS FARGO BANK, N.A., NOT IN ITS**
**INDIVIDUAL CAPACITY BUT SOLELY AS**
**TRUSTEE FOR THE RMAC REMIC TRUST**
**SERIES 2010-3,**
     Plaintiff

vs.                            Case No.  2010-58746-CA

**CARMEN TAUFER, ET AL.,**
     Defendants

---

## NOTICE OF FILING

     COMES NOW the Plaintiff, **WELLS FARGO BANK, N.A., NOT IN ITS INDIVIDUAL**

**CAPACITY BUT SOLELY AS TRUSTEE FOR THE RMAC REMIC TRUST SERIES 2010-3**,

by and through their undersigned attorney, and gives this Notice of Filing of **Original Mortgage,**

**Original Promissory Note which show an endorsement from the original lender payable to blank**

**and a Original Electronic Allonge from the original lender payable to Chase Home Finance LLC**

**and then an endorsement from Chase Home Finance LLC payable to Plaintiff and Copy of**

**Assignment of Mortgage** the same being attached hereto as <u>Exhibit "A"</u>. The original  loan documents

will be hand filed by local counsel at the time of the hearing

                       **LAW OFFICES OF GARY I. GASSEL, P.A.**
                       2191 Ringling Boulevard
                       Sarasota, Florida 34237
                       Primary email: Pleadings@Gassellaw.com
                       Secondary email: Efiling@Gassellaw.com
                       (941) 952-9322
                       Fax: (941) 365-0907

                       By: _____
                           GARY I. GASSEL, ESQUIRE
                           Florida Bar No. <u>500690</u>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been duly furnished First Class U.S. Mail to :

Carmen Taufer
c/o Martin Hannan, Esquire
9370 SW 72nd Street, Suite A266
Miami, Florida 33173
info@martinhannanpa.com

Unknown Spouse of Carmen Taufer
888 Douglas Road
Coral Gables, FL 33134

Storm Proof Windows & Doors Inc.
c/o Sylvia Montero, Registered Agent
3611 SW 15 Street
Miami, FL 33145

Puerta De Palmas Condo. Assoc., Inc.
c/o Awilda Esteras Esq.
150 W Flagler Street # 27th Floor
Miami, FL 33130
aesteras@srhl-law.com

Unknown Tenant #!
n/k/a Juan Romero
888 Douglas Road
Coral Gables, FL 33134

Unknown Tenant #2
n/k/a Ana Aguilar
888 Douglas Road
Coral Gables, FL 33134

this ___3___ day of _Feb_____, 2014.

_____
GARY I. GASSEL, ESQUIRE



# NOTE

October 3, 2007          Coral Gables                    FL
[Date]                              [City]                          [State]

888 S Douglas Rd #1502
Coral Gables, FL  33134

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 382,400.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
JPMorgan Chase Bank, N.A.
a bank which is organized and existing under the laws of the United States of America
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of  8.500          %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the First          day of each month beginning on November 1st  2007          . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on  October 1, 2037          , I still owe amounts under this Note. I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at JPMorgan Chase Bank, N.A., c/o Chase Home Finance, LLC
3415 Vision Drive, Columbus, OH  43219          or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,940.33

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

FLORIDA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N(FL) (0005)          Form 3210 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

 -5N(FL) (0006)

Page 2 of 3

Form 3210 1/01

Initials 



**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)   _____ (Seal)
-Borrower    **Carmen Taufer**    -Borrower

_____ (Seal)   _____ (Seal)
-Borrower       -Borrower

_____ (Seal)   _____ (Seal)
-Borrower       -Borrower

_____ (Seal)   _____ (Seal)
-Borrower       -Borrower

[Sign Original Only]

Pay to the Order of
Without Recourse
JPMorgan Chase Bank N.A.
BY_____
DIANNA NORSWORTHY/ASSISTANT SECRETARY

-5N(FL) (0005)       Page 3 of 3       Form 3210 1/01

**Allonge**

| | | |
|---|---|---|
| Borrower(s): | TAUFER CARMEN | Loan Amount: $382,400.00 |
| | 888 S DOUGLAS RD #1502 | Loan #: |
| | CORAL GABLES, FL 33134 | Note Date: 10/3/2007 |

**PAY TO THE ORDER OF:**

Chase Home Finance, LLC

**without recourse**

JP Morgan Chase Bank, N.A.

an Ohio Corporation

Angela Nolan

Angela Nolan
Assistant Vice President

**Allonge**

| | | |
|---|---|---|
| Borrower(s): | TAUFER CARMEN | Loan Amount: $382,400.00 |
| | 888 S DOUGLAS RD #1502 | Loan #: |
| | CORAL GABLES, FL 33134 | Note Date: 10/3/2007 |

**PAY TO THE ORDER OF:**   WELLS FARGO BANK, N.A., NOT IN ITS INDIVIDUAL CAPACITY,

BUT SOLELY AS TRUSTEE FOR RMAC REMIC TRUST, SERIES 2010-3

**without recourse**

Chase Home Finance, LLC
a Delaware Corporation

Brenda Townsend

Brenda K Townsend
Assistant Secretary

10

Name: CARMEN TAUFER          Location: KASOTA
Customer: RSVT          Pool: REMIC20103-PRIV



CFN 2008R0751021
OR Bk 26567 Pgs 0914 - 915; (2pgs)
RECORDED 09/15/2008 11:56:05
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Recording requested by:
JP Morgan Chase Bank, N.A.

1111 Polaris Pkwy
Columbus, OH 43240

When recorded, mail to:
Chase Home Finance, LLC
700 Kansas Lane
Monroe, LA 71203
Loan No:

Space above this line for Recorder's use

## Corporation Assignment of Mortgage

KNOW ALL MEN BY THESE PRESENTS THAT, JP Morgan Chase Bank, N.A. (Assignor), 1111 Polaris Pkwy, Columbus, OH 43240, for consideration paid, does hereby assign and set over to Chase Home Finance, LLC 194 Wood Avenue South Iselin, NJ 08830 (Assignee), that certain mortgage for $382,400.00 dated 10/3/07 from TAUFER CARMEN, to JP Morgan Chase Bank, N.A., filed for record in the office of the County Clerk of MIAMI-DADE, State of FL, on 10-10-07 and recorded as instrument no. 200 7R0989869 in book 3980 of Mortgage on page 3985 of the records of said county, together with the note or notes therein mentioned and all indebtedness secured thereby.

Property Address: 888 S DOUGLAS RD #1502, CORAL GABLES, FL 33134-
Legal Description:

I hereby certify that the precise residence of the within named Assignee is:
194 Wood Avenue South Iselin, NJ 08830

01/24/2008
JP Morgan Chase Bank, N.A.

Attest: _____
Witness: Christina Johnson

By: _____
C. Housley, Assistant Secretary

Attest: _____
Witness: M. Gardner

State of Louisiana
County of Ouachita

On 01/24/2008, before me, Karrie Harrell, a Notary Public in and for said State, personally appeared C. Housley who executed the within instrument as Assistant Secretary for JP Morgan Chase Bank, N.A., personally known to me, who by me being duly sworn, did dispose and say that they reside at 780 Delta Drive, Monroe, LA 71203, to be the person who executed the within instrument on behalf of the Corporation therein named, and acknowledged to me that such Corporation executed the within instrument pursuant to its By-laws or a resolution of its Board of Directors.

(SEAL)

_____
Karrie Harrell, Notary Public 69614
County of residence: Ouachita

My commission expires Lifetime.

This instrument was prepared at 780 Delta Drive, Monroe, LA 71203.

Karrie Harrell
Notary Public, ID# 69614
Ouachita Parish, Louisiana
Commission Expires, Lifetime

OR BK 26567 PG 0915
LAST PAGE

## LEGAL DESCRIPTION

Unit 1502 Puerta de Palmas, a Condominium according to the Declaration of
Condominium thereof, as recorded in Official Records Book 25822 Page 4596 of the
Public Records of Miami-Dade County, Florida.

CFN 2010R0574828
OR Bk 27398 Pgs 1850 - 1851; (2pgs)
RECORDED 08/25/2010 08:44:31
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Recording requested by:
Chase Home Finance, LLC

194 Wood Avenue South
Iselin, NJ 8830

**When Recorded Return to:**
T.D. Service Company – 671
1820 E. First St., Suite 300
Santa Ana, CA 92705
Loan No:

Space above this line for Recorder's use

## Corporation Assignment of Mortgage

KNOW ALL MEN BY THESE PRESENTS THAT, Chase Home Finance, LLC (Assignor), 194 Wood Avenue South, Iselin, NJ 8830, for consideration paid, does hereby assign and set over to ~~Wells Fargo Bank, N.A., Not~~ (Assignee), that certain mortgage for $382,400.00 dated 10/3/07 from TAUFER,CARMEN, to ~~Chase Home Finance, LLC,~~ filed for record in the office of the County Clerk of MIAMI-DADE, State of FL, on 10-10-2007 and recorded as instrument no. 2007R0909869 in book 25980 of Mortgage on page 3985 of the records of said county, together with the note or notes therein mentioned and all indebtedness secured thereby.
*in its individual Capacity, but solely as Trustee for RMAC Remic Trust, Series 2010-3
Property Address: 888 S DOUGLAS RD #1502, CORAL GABLES, FL 33134-
Legal Description: SEE Attached Exhibit "A"

** JPMorgan Chase Bank, N.A.
I hereby certify that the precise residence of the within named Assignee is:
751 Kasota Avenue
Minneapolis, MN 55414

01/24/2008
Chase Home Finance, LLC

3 5 5 7 4 4 0 D T 1

Attest: _____
Witness: Christina Johnson

By: _____
C. Housley, Assistant Secretary

Attest: _____
Witness: M. Gardner

State of Louisiana
County of Ouachita

On 01/24/2008, before me, Karrie Harrell, a Notary Public in and for said State, personally appeared C. Housley who executed the within instrument as Assistant Secretary for Chase Home Finance, LLC, personally known to me, who by me being duly sworn, did dispose and say that they reside at 780 Delta Drive, Monroe, LA 71203, to be the person who executed the within instrument on behalf of the Corporation therein named, and acknowledged to me that such Corporation executed the within instrument pursuant to its By-laws or a resolution of its Board of Directors.

(SEAL)

_____
Karrie Harrell, Notary Public69614
County of residence: Ouachita

My commission expires Lifetime.

This instrument was prepared at 780 Delta Drive, Monroe, LA 71203.

Karrie Harrell
Notary Public, ID# 69614
Ouachita Parish, Louisiana
Commission Expires, Lifetime



OR BK 27398 PG 1851
LAST PAGE

EXHIBIT "A"

TAUFER

SITUATE IN MIAMI-DADE COUNTY, FLORIDA, WHICH IS MORE PARTICULARLY
DESCRIBED AS: UNIT 1502 PUERTA DE PALMAS, A CONDOMINIUM ACCORDING TO THE
DECLARATION OF CONDOMINIUM THEREOF, AS RECORDED IN OFFICIAL RECORDS
BOOK 25822 PAGE 4596 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA
AND ALL APPURTENANCE THERETO AS SET FORTH IN THE DECLARATION OF
CONDOMINIUM THEREOF.

TAX ID: 03-4108-114-0490.

CFN 2007R0989869
OR Bk 25980 Pgs 3985 - 4006; (22pgs)
RECORDED 10/10/2007 14:52:34
MTG DOC TAX 1,338.40
INTANG TAX 764.80
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Return To:
JPMorgan Chase Custody Services
P.O. Box 8000
Monroe, LA 71211

LandAmerica Financial Group, Inc.
1560 Sawgrass Corporate Parkway #230
Sunrise, Florida 33323

This document was prepared by.
JP Morgan Chase Bank, NA
Andrea Marquez
4919 Memorial Highway, Suite 308
Tampa, FL 33634

_____[Space Above This Line For Recording Data]_____

## MORTGAGE

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated October 3, 2007
together with all Riders to this document.
(B) **"Borrower"** is
Carmen Taufer, a single person

Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is
JPMorgan Chase Bank, N.A.
Lender is a national banking association
organized and existing under the laws of the United States of America

FLORIDA Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010  1/01

-6(FL) (0005) 01
Page 1 of 16          Initials 
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is

1111 Polaris Parkway, Columbus, OH 43240

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated October 3, 2007

The Note states that Borrower owes Lender

Three hundred eighty-two thousand four hundred and 00/100                                   Dollars

(U.S. $      382,400.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2037.

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☒ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6(FL) (0005) 01                                   Page 2 of 16                       Initials                         Form 3010   1/01

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation. Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property. whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the COUNTY     [Type of Recording Jurisdiction] of   DADE                         [Name of Recording Jurisdiction]

See attached Schedule A

Parcel ID Number: TBA                      which currently has the address of
888 S Douglas Rd #1502                                           [Street]
Coral Gables                           [City], Florida   33134          [Zip Code]
("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."



-6(FL) (0005) 01                         Page 3 of 16               Initials       Form 3010  1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

-6(FL) (0005) 01                            Page 4 of 16                            Initials ___                 Form 3010   1/01

can be paid in full  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan. Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item. Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest



-6(FL) (0005) 01                           Page 5 of 16          Initials          Form 3010   1/01

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

-6(FL) (0005).01                      Page 6 of 16                 Initials                    Form 3010   1/01

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

-6(FL) (0005) 01                    Page 7 of 16                    Initials                    Form 3010   1/01

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

-6(FL) (0005) 01                    Page 8 of 16                 Initial                    Form 3010   1/01

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6(FL) (0005) 01          Page 9 of 16          Initials          Form 3010   1/01

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

1742880722

-6(FL) (0005).01                         Page 11 of 16          Initials          Form 3010  1/01

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

-6(FL) (0005) 01          Page 12 of 16          Initials          Form 3010   1/01

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

-6(FL) (0005) 01                              Page 13 of 16                    Initials               Form 3010  1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

-6(FL) (0005) 01                    Page 14 of 16          Initials ___          Form 3010   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)
Carmen Taufer                     -Borrower

Witness

_____
(Address)

_____
Witness

_____ (Seal)
                                  -Borrower

_____
(Address)

_____ (Seal)     _____ (Seal)
-Borrower                                     -Borrower

_____            _____
(Address)                                     (Address)

_____ (Seal)     _____ (Seal)
-Borrower                                     -Borrower

_____            _____
(Address)                                     (Address)

_____ (Seal)     _____ (Seal)
-Borrower                                     -Borrower

_____            _____
(Address)                                     (Address)

-6(FL) (0005) 01            Page 15 of 16            Form 3010   1/01

Republic of Italy
Province of Milan
City of Milan
Consulate General of the
United States of America

SS

~ 2 OCT 2007
County ss:

STATE OF FLORIDA,

The foregoing instrument was acknowledged before me this          - 2 OCT 2007 -          by

Carmen Taufer

who is personally known to me or who has produced   ITALIAN PASSPORT   as identification.

Notary Public

**Carmen Cunningham**
**Consular Officer**

## COMMISSION:
## INDEFINITE

-6(FL) (0005) 01                    Page 16 of 16                    Form 3010   1/01

**LEGAL DESCRIPTION**

Unit 1502 Puerta de Palmas, a Condominium according to the Declaration of
Condominium thereof, as recorded in Official Records Book 25822 Page 4596 of the
Public Records of Miami-Dade County, Florida.

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this 3rd          day of   October, 2007                           ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower" whether there are one or more persons undersigned) to secure
Borrower's Note to
JPMorgan Chase Bank, N.A

(the "Lender") of the same date and covering the Property described in the Security
Instrument (the "Property"), which is located at:
888 S Douglas Rd #1502
Coral Gables, FL  33134

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower
and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are
deleted and are replaced by the following:

**6. Occupancy.** Borrower shall occupy, and shall only use, the Property as
Borrower's second home. Borrower shall keep the Property available for Borrower's
exclusive use and enjoyment at all times, and shall not subject the Property to any
timesharing or other shared ownership arrangement or to any rental pool or
agreement that requires Borrower either to rent the Property or give a management
firm or any other person any control over the occupancy or use of the Property.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan
application process, Borrower or any persons or entities acting at the direction of
Borrower or with Borrower's knowledge or consent gave materially false, misleading,
or inaccurate information or statements to Lender (or failed to provide Lender with
material information) in connection with the Loan. Material representations include,
but are not limited to, representations concerning Borrower's occupancy of the
Property as Borrower's second home.

**MULTISTATE SECOND HOME RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT**
Form 3890 1/01                          Page 1 of 2                          Initials:
VMP-365R  (0411)          VMP Mortgage Solutions, Inc. (800)521-7291

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.



_____ (Seal)
                    -Borrower   Carmen Taufer

_____ (Seal)
                           -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                           -Borrower

**-365R** (0411)            Page 2 of 2            **Form 3890 1/01**

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this    3rd    day of    October, 2007    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to
JPMorgan Chase Bank, N.A

(the
"Lender") of the same date and covering the Property described in the Security Instrument
and located at:
888 S Douglas Rd #1502
Coral Gables, FL  33134

[Property Address]
The Property includes a unit in, together with an undivided interest in the common elements
of, a condominium project known as:
Puerta De Palmas

[Name of Condominium Project]
(the "Condominium Project"). If the owners association or other entity which acts for the
Condominium Project (the "Owners Association") holds title to property for the benefit or use
of its members or shareholders, the Property also includes Borrower's interest in the Owners
Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under
the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i)
Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii)
code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when
due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally
accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which
is satisfactory to Lender and which provides insurance coverage in the amounts (including
deductible levels), for the periods, and against loss by fire, hazards included within the term
"extended coverage," and any other hazards, including, but not limited to, earthquakes and
floods, from which Lender requires insurance, then: (i) Lender waives the provision in

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT
-8R (0411)         Form 3140 1/01
Page 1 of 3           Initials:  
VMP Mortgage Solutions, Inc
(800)521-7291



Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

VMP-8R (0411)                    Page 2 of 3                    Initials: ____    Form 3140 1/01

OR BK 25980 PG 4006
LAST PAGE

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)          _____ (Seal)
                     -Borrower          Carmen Taufer              -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                     -Borrower                                     -Borrower

-8R (0411)                    Page 3 of 3                    Form 3140 1/01